UNITED STATES of America, Plaintiff,

v.

Marvin SMITH, Defendant.

No. 91 CR 385 (KMW).

United States District Court,
S.D. New York.

June 11, 1993.

As Amended Aug. 19, 1993.

Allen D. Applbaum, Asst. U.S. Atty., Mary Jo White, U.S. Atty., New York City, for plaintiff.

Roger J. Bernstein, Bernstein & Milner, New York City, for defendant.

## MEMORANDUM OPINION AND ORDER

KIMBA M. WOOD, District Judge.

Defendant asserts that his Sixth Amendment right to counsel and his Fifth Amendment rights under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) were violated during the pre-indictment plea negotiation process. Defendant also asks this court to reconsider its previous decision that 21 U.S.C. § 845a(a), which provides enhanced penalties for drug offenses that occur near schools, carries a mandatory minimum one year sentence. For the reasons stated below, the court finds that defendant's ineffective assistance of counsel claim warrants further factual investigation to determine both whether he received ineffective of counsel and, if so, whether he suffered prejudice due to that ineffective assistance. Regarding defendant's other claims, however, the court adheres to its earlier decision that 21 U.S.C. § 845a(a) imposes a mandatory one year minimum sentence, and the court rejects defendant's assertion that the government violated his *Brady* rights by not giving him allegedly exculpatory material *prior to* his indictment.

## BACKGROUND

### A. The Offense Conduct

This case results from an investigation of postal employees, who allegedly obtained small amounts of cocaine for personal use, after work, at Clancy's Bar, near their postal station on Manhattan's Upper East Side. Mr. Smith and his friend Clovis Perkins spent evenings at Clancy's Bar. They both had a cocaine habit, and, at Clancy's Bar, Mr. Smith would occasionally sell Mr. Perkins small amounts of cocaine (one or two grams), which he obtained either from others in Clancy's Bar or from a source in Brooklyn.

In late 1990, Mr. Perkins, a Postal Service employee, needed to extricate himself from problems with his employer. He consequently introduced undercover Postal Service Inspectors to Mr. Smith. After accepting a beer from an inspector, Mr. Smith responded to the inspector's request for cocaine by obtaining slightly less than one gram of cocaine for the inspector from someone else in the bar. Six evenings later, the same undercover agent, along with another man, approached Mr. Smith in Clancy's Bar and asked him for two grams of cocaine. Mr. Smith said he had no cocaine on him, and that he was waiting there to meet a lady friend. They asked him to go to Brooklyn to get the cocaine, as a favor, because they were friends of Perkins, and Mr. Smith did so. He sold them slightly less than one and one-half grams of cocaine. He also made two small sales to undercover agents in Clancy's Bar. The total amount of cocaine he had sold to investigators/informants through that point, 4.02 grams, would have set Mr. Smith's Base Offense Level under the Sentencing Guidelines at 12 (which pertains to any amount of cocaine less than twenty-five grams).

On February 22, 1990, the undercover agent, seeking to identify Mr. Smith's source, sought a much larger transaction with Mr. Smith; he decided to try to buy half an

ounce from him. (Tr. 136). He approached Mr. Smith, who was with a date, offered him a drink, said he was out of work, and that he wanted half an ounce of cocaine. (Tr. 19–20). Mr. Smith told him that he sold cocaine only in small amounts, as favors for people, that he had never dealt with that much cocaine, and that he did not even know what the price would be for half an ounce. Mr. Smith did agree to check with his source, and when he did so, he learned that he could not buy packages any larger than three grams.

A few days later, the Assistant United States Attorney investigating the case suggested to the undercover agent that he attempt to buy one ounce—twice the amount of cocaine that the agent had planned to buy from Mr. Smith—because the higher quantity would put Mr. Smith into a higher offense level under the Sentencing Guidelines. The agent acceded to the prosecutor's suggestion. He asked Mr. Smith to provide him with one ounce and offered to drive Mr. Smith to the source's Brooklyn location. On February 27, 1991, the agent drove Mr. Smith to the source. Mr. Smith waited over an hour for his source to put together many small bags of cocaine. Upon emerging with the cocaine, Mr. Smith was arrested. When agents searched the source's premises, they found, consistent with Mr. Smith's testimony that he did not deal in large amounts of cocaine, that this "buy" had cleaned out the source's supply.

## B. Pre–Indictment Plea Negotiations

According to defense counsel, the government clearly had a strong case against Mr. Smith. There were tape recordings of the "buys," and defense counsel expected supporting testimony from the undercover agents and informants. Thus, he advised Mr. Smith to accept the government's first pre-indictment plea offer, which was based on the government's erroneous belief that the transactions involved cocaine with a combined weight of less than 25 grams; the consequent base offense level would be 14, prior to any acceptance of responsibility reduction. *See* March 18, 1991 letter, Government to Defense Counsel. Compared with the alternative promised by the Govern-

ment—an indictment including a schoolhouse count, which carries a mandatory one year minimum sentence—accepting the government's offer seemed a prudent course, even though the government would require a stipulation to the applicability of Section 2D1.2(a)(1) of the Guidelines, which adds an additional two points for drug offenses occurring near a protected location (schoolhouse). According to defense counsel, Mr. Smith seemed prepared to accept his advice. Nov. 1, 1991 letter, Defense Counsel to Court.

Approximately ten days after receiving the government's initial offer, however, defense counsel received a second letter, with a superseding offer from the government. The second letter advised defense counsel that, in fact, the amount of cocaine involved in the transactions exceeded 25 grams, and that the consequent offense level would be 16—rather than 14—before the acceptance of responsibility reduction. This information changed defense counsel's view of the prudence of accepting the one-count plea bargain. Unlike the first offer (which would have made Mr. Smith eligible for a split sentence—a base offense level of 14, which would be diminished by two points for acceptance of responsibility), the second offer required a minimum of fifteen months in prison (a base level of 16, minus two points for acceptance of responsibility). This change—to a plea offer requiring a minimum of 15 months in prison—devalued the offer in defense counsel's mind because it rendered valueless the dropping of the schoolhouse count (the only effect of which is to require a one-year minimum sentence). As defense counsel put it, "there appeared to be no clear benefit to pleading guilty as long as the large February 27th transaction had to be contested and as long as the government's position was that more than one year had to be served in any event." *Id.* at 2.

Seeing no benefit in accepting this plea bargain, defense counsel thus advised Mr. Smith that the only way to diminish the effect of the February 27th transaction on Mr. Smith's sentence lay in proceeding to a trial in which Mr. Smith would acknowledge his guilt for the four small transactions, but would fight on the February 27th transac-

tion. Because the agent's solicitation of the February 27th transaction did not rise to the level required for an entrapment defense, it is difficult to envision what defense, if any, could have been mounted at trial. In essence, defense counsel apparently hoped for jury nullification on the large transaction count. Mr. Smith accepted his attorney's advice and rejected the plea bargain. *Id.*

### C. The Indictment and Mr. Smith's Plea

Soon after Mr. Smith rejected the plea bargain, the government filed an indictment against him. The indictment, however, did not charge the February 27th transaction, apparently because of doubts over whether venue for that transaction—which the participants arranged in Manhattan but consummated in Brooklyn—would lie in the Southern District. Nonetheless, it did contain the schoolhouse count the prosecutor promised would follow from Mr. Smith's rejection of the pre-indictment plea bargain. With the reason for going to trial—contesting the February 27th transaction—having disappeared, defense counsel advised Mr. Smith to plead to the indictment's four counts. Mr. Smith accepted the advice.

### D. Events Subsequent to the Plea

Although venue concerns prompted the government not to charge Mr. Smith with the February 27th transaction in this court, the government nonetheless offered that transaction as relevant conduct for sentencing purposes; if it were deemed relevant conduct, it would raise Mr. Smith's base offense level, which would raise his minimum sentence. I held a *Fatico* hearing on this issue, and decided not to include the February 27th buy as relevant conduct, because the amount of cocaine the government caused Mr. Smith to procure was wholly atypical of the amounts of cocaine that Mr. Smith had dealt in the past, and I concluded that Mr. Smith, extremely accommodating by nature,

was lured into this conduct by the government.[1]

In addition to raising issues I addressed at the *Fatico* hearing, Mr. Smith also argued that the schoolhouse count does not carry a mandatory one-year penalty. I rejected this position in an earlier opinion, issued on March 3, 1992, 785 F.Supp. 52.

### E. Issues Currently Under Consideration

As mentioned briefly above, three issues remain to be resolved before I can sentence Mr. Smith. First, Mr. Smith asserts that I should reconsider my decision of March 1992, in light of *United States v. Rodriguez*, 794 F.2d 24 (2d Cir.1986), *rev'd*, 480 U.S. 522, 107 S.Ct. 1391, 94 L.Ed.2d 533 (1987), which was not brought to the court's attention before its earlier decision. Second, he argues that the government violated his *Brady* rights by failing to disclose during plea negotiations that one of the government's purposes in enticing Mr. Smith to sell an amount of cocaine larger than he usually sold was to cause him to be sentenced within a higher guideline range. Third, he alleges that his attorney's failure to advise him, when he was considering the government's first plea offer, of the option of a *Fatico* hearing to contest the relevancy of the February 27th transaction constituted ineffective assistance of counsel, and that he was prejudiced thereby. Had he known of the *Fatico* option, he asserts, he would have accepted the pre-indictment offer to plead to the four small sales and challenged the relevancy of the February 27th sale to his sentence. By accepting the plea offer, he would have avoided the *statutory*, mandatory one year minimum sentence on the schoolhouse count. He asks this court to redress these constitutional violations by vacating the guilty plea and requiring the government to renew its initial plea offer.

### DISCUSSION

#### A. The Schoolhouse Statute

■ Mr. Smith's first two arguments can be disposed of briefly. First, *United States*

---

1. The court, in determining that the February 27th buy was not relevant conduct, intends no criticism of the agent's attempt to locate defendant's source by leading defendant to deal in an amount of drugs atypical for defendant. The government's aim can be legitimate without triggering automatically the conclusion that a particular defendant should spend more time in prison because the sale took place.

*v. Rodriguez, supra,* does not warrant reconsideration of my March 1992 ruling. *Rodriguez* concerns the interplay of the Bail Reform Act, 18 U.S.C. § 3147, and the Probation Act, 18 U.S.C. § 3651. Section 3147 states that "a person convicted of an offense while released ... shall be sentenced, in addition to the sentence prescribed for the offense to (1) a term of imprisonment of not less than two years and not more than ten years if the offense is a felony...." Rodriguez argued that § 3147 did not repeal § 3651, which empowered the court to suspend Rodriguez' sentence and impose probation. The Supreme Court agreed with defendant.

Defendant in this case argues that *Rodriguez* stands for the proposition that the language of § 3147 does not impose a mandatory minimum sentence, and argues that 21 U.S.C. § 845a(a) should be treated analogously. This view misconstrues the focus of the Supreme Court's *Rodriguez* opinion. That opinion states that, even if the language of § 3147 would be properly interpreted as containing a mandatory minimum, § 3651 was also applicable, and that statute permitted the imposition of probation rather than prison. *Rodriguez* therefore does not, as Mr. Smith suggests, say that courts should be loathe to interpret criminal statutes as containing mandatory minimum prison terms. It does not directly or indirectly suggest that it would be erroneous to interpret § 845a(a) as containing a mandatory minimum prison term. It suggests that even if § 845a(a) requires a mandatory minimum, one could read § 3651 to permit a suspended sentence or probation notwithstanding § 845a(a). However, § 3651 has now been explicitly repealed,[2] and was at the time of the offenses committed by defendant. *Rodriguez* therefore provides no support to defendant. The court adheres to its earlier decision interpreting § 845a(a).[3]

### B. Alleged *Brady* Violation

■ Defendant's second argument—asserting a *Brady* violation—is similarly without merit. As the government points out, Mr. Smith has not provided the court with any precedent for the proposition that the government has an obligation to turn over *Brady* material *before an indictment is even filed.* Moreover, it is unclear how the information involved can be viewed as exculpatory material. Defendant and defense counsel knew, before making the plea decision, that Mr. Smith had been lured into the fifth, atypical sale by a government agent. The government's plan had no impact whatsoever on determining Mr. Smith's guilt or innocence of the acts alleged. To the extent the information is helpful for sentencing, the defense obviously has received it and therefore cannot claim a *Brady* violation vis-a-vis the sentencing portion of Mr. Smith's case.

### C. Right to Counsel

■ In contrast to his first two arguments, Mr. Smith's third argument appears potentially to have merit. Before turning to a legal analysis of it, however, it is helpful to elaborate first on Mr. Smith's allegations of what his counsel did that was ineffective.

#### 1. *Defendant's Argument*

Mr. Smith argues that his attorney ineffectively assisted him by failing to inform him of the option of accepting the government's pre-indictment plea bargain, but avoiding the

---

**2.** Pub.L. 98–473, Title II.c.II, § 212(a)(2), Oct. 12, 1984, 98 Stat.1987, repealed this section effective Nov. 1, 1987, pursuant to section 235 of Pub.L. 98–473.

**3.** I also reject defendant's other arguments for reconsideration. Contrary to Mr. Smith's view, the 1990 amendment to § 845a(a) does not support his proffered interpretation. First, the 1990 version of the statute is not the one applicable here. Courts should be reluctant to use subsequent legislative history to interpret a criminal statute. Second, even if the amendment is considered, it counts at least as strongly in the

government's favor, because it makes clear that there is a mandatory minimum, and suggests that the mandatory minimum was Congress' earlier intent, in a pre–1990 statute that was concededly unartfully drafted.

Defendant's arguments on legislative intent and overbreadth of the schoolhouse statute are foreclosed by *United States v. Jones,* 779 F.2d 121 (2d Cir.1985), *cert. denied,* 475 U.S. 1031, 106 S.Ct. 1236, 89 L.Ed.2d 344 (1986), and *United States v. Agilar,* 779 F.2d 123 (2d Cir.1985), *cert. denied,* 475 U.S. 1068, 106 S.Ct. 1385, 89 L.Ed.2d 609 (1986), respectively.

feared fifteen month sentence by contesting the relevancy of the amount involved (and thus the appropriateness of Level 16) at a *Fatico* hearing. He asserts that because the government had very strong evidence against him, including tape recordings of the buys and testimony from undercover agents and informants, defense counsel should have considered an alternative to fighting the February 27th buy at *trial—i.e.,* he should have considered accepting the plea agreement, and fighting that buy at *sentencing.* The advantage to defendant of this course was obvious; in avoiding the schoolhouse count, he avoided a one-year *statutory* mandatory minimum in prison, and opened up the possibility of probation if the court could be persuaded to depart downward from his Sentencing Guideline range. Defense counsel, however, did not advise Mr. Smith of this option; Mr. Smith was not told that if he pled guilty, he could argue for a downward departure based on the February 27th buy being both (1) atypical of his conduct, and (2) the product of conduct close to entrapment. He argues that it was especially important for him to receive this advice, because his atypicality argument is particularly well-supported: the Court found that his testimony at the *Fatico* hearing subsequent to his ultimate plea was straightforward and convincing with respect to how atypical the amount involved in the February 27th buy was for him, and his record of employment (including his current job in a large law firm's mail room) provides further reason to believe his testimony that he sold small amounts of cocaine as "favors," and did not seek to deal in large amounts of drugs. However, it was only after defendant was indicted that defense counsel considered this option; he was left, however, with no way to restore to defendant his pre-indictment ability to avoid the one-year mandatory minimum associated with the schoolhouse count.

### 2. *Legal Requirements for Ineffective Assistance of Counsel*

Under *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), a defendant claiming ineffective assistance of counsel must make two showings: first, that his counsel's conduct fell below "an objective standard of reasonableness" under "prevail-

ing professional norms," *id.* at 687–88, 104 S.Ct. at 2064–65, and, second, that there is a "reasonable probability that, but for counsel's unprofessional errors, the result would have been different," *id.* at 694, 104 S.Ct. at 2068. In evaluating such a claim, a court "must indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance." *United States v. Aguirre,* 912 F.2d 555, 560 (2d Cir.1990), quoting *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065. Although in the past, there may have been some doubt as to whether defendants in Mr. Smith's position could raise such a claim, "all federal and state courts presented with this issue . . .—where counsel's ineffective representation results in a defendant's rejection of an offered plea bargain, and in the defendant's decision to proceed to trial—[have concluded that these situations] also give rise to a claim of ineffective assistance of counsel." *In Re Alvernaz,* 2 Cal.4th 924, 8 Cal.Rptr.2d 713, 719 (1992) (citations of collected cases omitted). *See also United States ex rel. Caruso v. Zelinsky,* 689 F.2d 435, 438 (3d Cir.1982) ("The decision to reject a plea bargain and plead not guilty is [ ] a vitally important decision and a critical stage at which the right to effective assistance of counsel attaches."). In a decision involving counsel's advice regarding the Sentencing Guidelines, the Third Circuit has explained that the relevant inquiry is whether counsel's failure to apprise defendant of his right to challenge the typicality of part of his conduct, for sentencing purposes, deprived defendant of the right to make a reasonably informed decision of whether to accept the plea offer. *United States v. Day,* 969 F.2d 39, 43 (3d Cir.1992) (citations omitted).

### 3. *Applied to this Case*

In this case, the court faces an unusual situation: defendant's current defense counsel maintains that his own performance in connection with the earlier plea offer fell short of the standards necessary for effective assistance of counsel. Specifically, counsel alerts the court to the fact that he failed to advise his client (1) that there were venue concerns with the February 27th buy that were likely to (and did) cause the prosecutor not to indict defendant on the February 27th

buy, and that the prosecutor was likely, instead, to ask the court to include the February 27th buy as "relevant conduct," and (2) that, under the Sentencing Guidelines, a defendant pleading guilty often retains the right to a hearing challenging whether "relevant conduct" includes conduct other than the conduct of the conviction, such as, here, conduct resulting from an agent luring the defendant into a drug sale atypical of the defendant. Counsel therefore failed to convey this information to Mr. Smith. Indeed, counsel informs the court that defendant's decision to reject the plea offer was made on the basis of a set of information that included the counsel's allegedly incorrect statement that if he accepted the plea, his sentence level would necessarily be determined in large part by the large amount of cocaine from the February 27th buy.

I conclude that on the record currently before me, it is impossible to determine whether or not defense counsel's failure to advise Mr. Smith of the *Fatico* hearing option violated Mr. Smith's Sixth Amendment rights, because it is unclear whether, under the terms of the initial plea bargain offer, a *Fatico* hearing of the type defense counsel currently envisions ever really was available to Mr. Smith.

The government argues that, "[a]s a practical matter, the Government would never have accepted a pre-indictment plea from the defendant that did not also include a stipulation to the entire amount of the cocaine involved in this case—an amount that would have to have included the February 27, 1991 transaction." September 14, 1992 letter, Government to Court at 2. Defense counsel takes issue with this assertion, however, arguing that despite the statement in the government's March 27, 1991 plea offer letter that the amount involved in the various transactions exceeded 25 grams, the government did not request a stipulation to that effect and would not have required Mr. Smith to stipulate to that amount in order to accept the plea bargain. He thus argues that the *Fatico* option would have remained had Mr. Smith accepted the pre-indictment plea offer. September 22, 1992 letter, Defense Counsel to Court. Defense counsel's

position is undercut somewhat by his initial letter to the court in which he stated that his error lay in not "think[ing] of or suggest[ing] to Mr. Smith *a counter-offer* of pleading to the proposed charge while reserving the issue of the February 27th transaction for a *Fatico* hearing." November 1, 1991 letter, Defense Counsel to Court at 3 (emphasis added). This initial view indicates that defense counsel did not understand the original offer as allowing for a *Fatico* hearing, and buttresses the government's assertion that such a deal was unlikely.

As this exchange of letters demonstrates, whether the government's original plea offer precluded the option of a *Fatico* hearing is far from clear, and the record I have before me—consisting almost exclusively of after-the-fact assertions regarding what would have happened had Mr. Smith accepted the plea—is insufficient for me to resolve this issue. Consequently, because I must determine whether there ever was a *Fatico* hearing option in order to rule on Mr. Smith's Sixth Amendment claim, I conclude that I need additional information regarding plea bargaining procedures. For example, did the typical plea agreement in the Southern District of New York in March 1991 for offenses such as the one here under consideration require a defendant to stipulate to a particular amount of cocaine? Have other defendants in the plea bargaining process requested the right to leave open the *Fatico* hearing option for part of their conduct, after acceding to a pre-indictment plea to other conduct? If so, what was the government's response? Have any defendants who did not raise the issue during plea negotiations received *Fatico* hearings to contest the quantity of cocaine after accepting pre-indictment plea offers? Once I have received responses to these questions, and any other information counsel think is relevant to resolving the issue at hand, I will be in a better position to determine whether Mr. Smith's received inadequate assistance of counsel. If I so conclude, I will address at that point the appropriate remedy.

## CONCLUSION

The court adheres to its earlier ruling that 21 U.S.C. § 845a(a) imposes a mandatory one

year minimum sentence, and rejects Mr. Smith's contention that the government violated his *Brady* rights. The court finds that the current record does not allow for a conclusion regarding whether defendant received ineffective assistance of counsel in connection with the initial plea offer. Counsel for the respective parties should confer with each other and, by July 2, 1993, submit to chambers their respective views on the best manner in which to supplement the record to respond to the questions raised in this opinion.

SO ORDERED.