Jose YANEZ, Plaintiff,

v.

John KEANE, Superintendent, Sing Sing
Correctional Facility, Defendant.

No. 95 Civ. 2259 (CSH)(AJP).

United States District Court,
S.D. New York.

Aug. 6, 1998.

Murray Richman, Bronx, NY, for Plaintiff.

Avi Lew, Asst. Atty. Gen., New York City,
for Defendant.

### MEMORANDUM AND ORDER

HAIGHT, District Judge.

Claiming ineffective assistance of counsel,
Jose Yanez petitions this Court for a writ of
habeas corpus pursuant to 28 U.S.C. § 2254.
By Report and Recommendation dated February 9, 1998, Magistrate Judge Andrew J.
Peck recommends that this Court deny Yanez's petition. Yanez objects to Judge
Peck's Report and Recommendation on the
ground that it overlooks the Second Circuit's
recent opinion in *Boria v. Keane,* 83 F.3d 48,
clarified on rehearing, 90 F.3d 36, corrected
op. 99 F.3d 492 (2d Cir.1996), *cert. den. sub.
nom. Keane v. Boria,* —— U.S. ——, 117
S.Ct. 2508, 138 L.Ed.2d 1012 (1997).

In *Boria,* the Second Circuit concluded
that it was ineffective assistance of counsel
for a lawyer not to discuss with his client the
advisability of accepting a plea offer where
the lawyer believed that rejecting the offer
would be suicidal. *See* 83 F.3d at 51. By
contrast, Yanez's trial counsel, Joseph T.
Klempner, firmly believed that an appeal of
the denial of Yanez's suppression motion had
merit and so advised his client in discussing a
plea offer. Moreover, for the reasons set
forth in Judge Peck's report, Klempner's belief was warranted. *See* Report and Recommendation of February 9, 1998 at 19–26.
*Boria* is thus inapplicable to the facts of this
case.

Accordingly, I adopt Judge Peck's Report
and Recommendation in its entirety, and Yanez's petition is hereby denied.

It is SO ORDERED.

*REPORT AND RECOMMENDATION*

PECK, United States Magistrate Judge.

Petitioner Jose Yanez was found guilty by the jury and sentenced to a term of 20 years to life imprisonment for narcotics sales offenses. (*See* Petition, dated February 6, 1995, ¶¶ 1–6.) Yanez petitions for a writ of habeas corpus alleging ineffective assistance of trial counsel. Specifically, Yanez alleges that after the trial court denied his "motion to suppress wiretaps which conclusively established his guilt, Petitioner was offered a plea bargain with an agreed upon sentence of 8 years to life," conditioned on waiving the right to appeal from the denial of the suppression motion. (Petition ¶ 12(A).) According to Yanez, he "rejected the [plea] offer and went to trial knowing he would be convicted and would receive a much harsher sentence based on his attorney's [allegedly] inaccurate and untenable advice that his appeal [of the suppression motion] had merit and a reasonable chance of success." (*Id.*) Yanez is represented on this habeas petition by a different retained counsel.

For the reasons set forth below, I recommend that Yanez's habeas corpus petition be denied.

*FACTS*

In the fall of 1987, as a part of a narcotics investigation, a court-approved wiretap recorded petitioner Jose Yanez participating in drug-related conversations with the investigation's target, John Smith. (Klempner 6/10/93 Aff. ¶ 3; *see also* Yanez 1st Dep't Br. at i–ii.) As a result, Yanez was tried and convicted of conspiracy in the second degree, and criminal sale of a controlled substance in the first and second degrees. (Petition ¶ 4.)

*The Eavesdropping Warrants*

An informant introduced an undercover police officer to suspected drug dealer John Smith, and the undercover made several purchases from Smith. (Yanez 1st Dep't Br. at i.) The police installed pen registers on Smith's phones. (*Id.*) Because the police still had not identified Smith's supplier, they applied for a wiretap on his phones. (*Id.*) The police affidavit for the wiretap warrant stated that normal surveillance techniques would not suffice. (*Id.* at i–ii.) Specifically,

Both Smith's residences had been put under surveillance but with no real success. Aside from Smith's son, investigators had not been able to connect anyone else to Smith's drug-selling activities through surveillance. At [Smith's] 135th Street apartment building, it had been impossible to distinguish between other tenants and their guests and people who were going to do business with Smith. And, surveillance of Smith's New Jersey home had been terminated after two days because a strange vehicle in the quiet suburban community had been too obvious (A49–50).

(Gov't 1st Dep't Br. at 5–6.) Based on the police affidavit, the state court granted a wiretap warrant. (*Id.* at 7.)

Before trial, Yanez's counsel moved to suppress the wiretapped conversations involving Yanez, and Justice Leslie Crocker Snyder denied the motion.

*Yanez's Rejection of a Guilty Plea Offer Conditioned on Waiver of Appeal of the Denial of the Suppression Motion*

After Justice Snyder denied Yanez's suppression motion, the government offered him "a plea with an agreed upon sentence of 8 years to life imprisonment, upon the condition that [he] waive [his] right to appeal the denial of the [suppression] motion." (Yanez 6/15/93 Aff. ¶ 3.) After discussion with his trial attorney, Yanez rejected the plea offer. He explained:

4. In spite of the fact that I knew that because of the denial the motion I would probably be convicted at trial and that I faced a mandatory minimum sentence of 15 years to life imprisonment and might receive more time, I rejected the plea offered and went to trial because I had become convinced of the merits of my motion and because [his attorney] Mr. Klempner told me that an appeal of its denial would have merit.

5. Mr. Klempner never advised me that my chances of a reversal were slim nor did he make any effort to persuade me to take the plea offered. If he had done so and given me a realistic assessment of my

chances on appeal, I would have done the only logical thing and waived my appeal and accepted the plea bargain offered.

(*Id.* ¶¶ 4–5.) Yanez was not passive in this decision, however. He read the suppression motion papers and the cases cited therein, as well as other cases that he obtained from the prison law library. (*Id.* ¶ 2.)

Yanez's counsel, Mr. Klempner, confirmed that he advised Yanez that an appeal would have merit:

> 3. In the fall of 1987, as a part of the investigation which resulted in the indictment, electronic eavesdropping orders were issued permitting the wiretapping of telephones utilized by John Smith who was charged as a co-conspirator and co-defendant in this indictment. Mr. Yanez was tape recorded participating in drug related conversations on the Smith wiretap. After the denial of defense motions to suppress the wiretaps which contained overwhelming evidence of the defendants' guilt, but without which there was no case against Mr. Yanez, it was apparent that Mr. Yanez had little realistic chance of an acquittal and I engaged in plea bargaining with the District Attorney and the court which resulted in a plea offer with an agreed upon sentence of 8 years to life imprisonment upon the condition that Mr. Yanez waive his right to appeal the denial of his pretrial motion to suppress. *This offer was conveyed to Mr. Yanez who rejected it because he did not want to waive his right to appeal the denial of his motion to suppress which he believed to be meritorious.*
>
> 4. *Mr. Yanez* himself who was unable to make bail pending trial, *took an active role in researching cases* in the prison law library relevant to the various wiretap issues. *Both he and I came to believe in the merit of the defense contention that law enforcement personnel had failed to exhaust conventional investigative techniques before applying for and receiving court approval to wiretap* the Smith phones, see Defendant's Motion and Brief on Appeal. *Following the denial of the motion, I continued to believe—and to advise Mr. Yanez—that an appeal of the denial would have merit and a reasonable*

*chance of success.* When it became apparent that Mr. Yanez did not want to waive his right to appeal the denial as part of a plea agreement and indeed told me of his reluctance to do so, I did not attempt to persuade him to plead guilty, despite my belief that his chances at trial would be slim.

(Klempner 6/10/93 Aff. ¶¶ 3–4, emphasis added.)

### *Trial and Sentencing*

The trial evidence against Yanez largely consisted of his wiretapped conversations with Smith, as "translated" (from drug shorthand) by the police, and police testimony of undercover purchases from Smith linked to Yanez's phone conversations. (*See generally* Gov't 1st Dep't Br. at 8–41.) Because the linchpin of Yanez's habeas petition is that the evidence against him at trial was not only sufficient but overwhelming, the Court need not further discuss the trial testimony. Yanez was found guilty of conspiracy in the second degree and criminal sale of a controlled substance in the first and second degrees, but also found not guilty of another count of criminal sale of a controlled substance in the second degree. (Trial Tr. at 950–52.) He was sentenced to concurrent terms, with a maximum term of 20 years to life. (*See* Petition ¶ 3; Klempner 6/10/93 Aff. ¶ 2; Gov't 1st Dep't Br. at 1–2.)

### *Yanez's Direct Appeal*

Yanez appealed to the First Department, based largely on the failure to suppress the wiretap evidence. (*See* Yanez 1st Dep't Br. at 1–14.) Under New York law, an eavesdropping warrant may issue only "[u]pon a showing that normal investigative procedures have been tried and have failed, or reasonably appear to be unlikely to succeed if tried, or to be too dangerous to employ." N.Y.C.P.L. § 700.15(4). (*See* Yanez 1st Dep't Br. at 1.) Moreover, the affidavit cannot merely parrot the statute, but must contain a "full and complete statement of facts establishing that normal investigative procedures have been tried and have failed." C.P.L. § 700.20(2)(d). (*See* Yanez 1st Dep't Br. at 1–2.) Yanez's counsel argued on ap-

peal that the search warrant affidavit was insufficient to satisfy this standard:

> Careful examination of the affidavits in support of the eavesdropping warrants reveals that the leads and evidence which were garnered during the investigation were either wholly ignored or never pursued by the [police] team. . . . Among the resources available to the police were a confidential informant, an undercover officer, a large team of surveillance officers, and a number of pen register devices.
>
> .        .        .        .        .
>
> One should reasonably expect law enforcement personnel to have been giddy over the prospect of an investigation containing a trusted informant, an undercover officer who had already infiltrated the seller's confidence and succeeded in making direct purchases, ample manpower to conduct unlimited surveillance at known locations, and printouts of all telephone numbers called by the suspect. The possibilities for creative law enforcement are endless.

(Yanez 1st Dep't Br. at 3, 8.)

As to the informant, Yanez's appeal argued that:

> The confidential informant who introduced the undercover officer to Smith and was trusted by Smith. Proper utilization of this informant could surely have provided further information or evidence if the attempt had been made. Instead, the investigators elected to ignore the informant once the introduction had been made. No explanation was provided for the failure of the police to continue to use the informant.
>
> .        .        .        .        .
>
> The informant in this case was cooperative. He was aware of, and a trusted accomplice in John Smith's drug selling business. According to Detective Demetriou's affidavit, the informant was
>
>> . . . *approached by* John Smith with respect to obtaining customers to buy heroin from JOHN SMITH. . . .
>
> In other words, rather than being reluctant to deal with the informant, Smith had actively sought him out in an attempt to find new markets for his dealing. Never-

theless the affidavit is silent as to any post-introduction use of the informant in an attempt to introduce other buyers or learn Smith's sources of supply.

(*Id.*)

Yanez's counsel was similarly critical of the police's use, or lack thereof, of the undercover:

> Next the police succeeded in having an undercover officer make direct purchases of narcotics from Smith. While that officer, Detective Victor Harris, managed to make no less than three pre-eavesdropping purchases from Smith, he never once attempted to pursue techniques which have become common tools in modern law enforcement whereby the police seek to extend their investigation to the associates, higher-ups and suppliers of suspects with whom they have been able to deal on a face-to-face basis.
>
> .        .        .        .        .
>
> The buys made by Detective Harris provided a window to Smith's operation and established a direct, ongoing contact between the police and Smith. Yet Detective Harris never attempted to exploit his position to accomplish the additional goals of the investigation. . . . [H]e failed to demand an immediate adjustment, a technique often used to require a dealer to meet immediately with his supplier to make up the difference. Nor did he order drugs in sufficiently escalating amounts to require Smith to bring his supplier onto the scene, thereby making him visible to, and identifiable by the backup team. No attempt seems to have been made to "cut out" Smith and go directly to his suppliers, or to form an illicit drug partnership with Smith, or to interest Smith in accepting "cut" materials as partial payment for the drugs purchased (a technique which has been successfully employed in enabling the backup team to follow the "cut" as it goes back to Smith's suppliers).

(*Id.* at 4, 8–9.)

Yanez's appellate brief was equally critical of the police failure to surveil Smith:

The paucity of surveillance conducted by the police in the pre-wiretap phase of the investigation is nothing less than astounding. No meaningful effort whatsoever was made to follow Smith either before or after the sales to the undercover officer, or to identify the individual who brought Smith the drugs prior to each transaction and left with the proceeds after each transaction.

The court credited that portion of the application which alleged that visual surveillance was impossible to maintain due to the fact that Smith had two residences. The court found no irony in its determination that

> [t]he surveillance of the apartment was unsuccessful because the building was a multiple dwelling. As such, numerous people entered and exited the building at all times and the police could not determine which people were visiting the defendant. The New Jersey surveillance encountered difficulty remaining inconspicuous because the area was quiet and residential....

The court below appears to have apparently never questioned the reasonableness of these opposing positions. That the police are unable to ascertain sufficient information by visual surveillance of either a city-dweller's building or a suburban home is an incredible damnation of the usefulness of surveillance. In effect the court was sanctioning the interception of telephone conversations not as a last resort, but as a substitute for surveillance.

(*Id.* at 4–5.)

Finally, Yanez's counsel was critical of the police's failure to use the pen register data: "None of the names was ever heard again in the investigation, and no effort to trace any of the [pen register] leads was ever made." (*Id.* at 6.) Indeed, Yanez pointed out that Justice Snyder ruled that " 'alternative investigative procedures had been adequately pursued *without resort to the pen register evidence.*' " (*Id.* at 7, quoting from Justice Snyder's decision.) According to Yanez, the "only plausible conclusion one can draw regarding the pen registers is that they were used exclusively to gain authorization to eavesdrop, and were never used or intended to be used as a legitimate investigative technique." (Yanez 1st Dep't Br. at 7–8.)

Following this factual critique of the search warrant affidavits, Yanez's counsel marshalled the case law analyzing C.P.L. § 700.15 and § 700.20, including *United States v. Lilla*, 699 F.2d 99 (2d Cir.1983), and *People v. Viscomi*, 113 A.D.2d 76, 495 N.Y.S.2d 298 (4th Dep't 1985), *appeal denied mem.*, 67 N.Y.2d 658, 499 N.Y.S.2d 1055, 490 N.E.2d 572 (1986). (*See* Yanez 1st Dep't Br. at 10–14.)

The People filed a sixty-nine page response brief (*see generally* Gov't 1st Dep't Br.)—clearly some indication that Yanez's appeal was not frivolous. (*See* Gov't 7/21/94 Letter to 1st Dep't at 3–4: "the People certainly took the claim seriously...." ) The government pointed out that "any attempt to reconnoiter from a public area inside [Smith's apartment] building would not only have been absurd, it would have jeopardized the investigation," because the undercover knew that "at least one doorman was working for Smith." (Gov't 1st Dep't Br. at 46.) Similarly, the People explained that the undercover had "tried to take advantage of his relationship with Smith," but "that relationship was tenuous." (*Id.* at 47.) As to use of the informant to learn that identity of Smith's supplier, the government pointed out that the warrant "application clearly states that the investigators were concerned about the informant's safety." (*Id.* at 51.) As to the pen register calls, "the investigators were not, however, in a position to track down defendants' connections with those associated with the voluminous other phone numbers that the pen registers recorded." (*Id.* at 48–49.) The People argued that Yanez's other suggestions were "speculative" and might have "jeopardize[d] the entire investigation." (*Id.* at 51 & n. *.) The People also distinguished the facts of Yanez's case from the two main cases cited in Yanez's brief, *Lilla* and *Viscomi*. (Gov't 1st Dep't Br. at 52–55.)

### The First Department Affirmed Yanez's Conviction

The First Department affirmed Yanez's conviction. *People v. Yanez*, 178 A.D.2d 357, 577 N.Y.S.2d 621 (1st Dep't 1991), *leave denied mem.*, 79 N.Y.2d 954, 583 N.Y.S.2d 209,

592 N.E.2d 817 (1992). The First Department upheld Justice Snyder's refusal to suppress the wiretap evidence, finding that a "common sense" reading of the affidavit demonstrated that the police had tried normal investigative techniques and they had not worked. The decision on this issue reads in full:

> Defendants' respective motions to controvert the eavesdropping warrant were properly denied. A "common sense" review of the affidavit offered to the issuing court reveals that normal investigative procedure had been tried and had failed (C.P.L.700.15[4]). The authorities were looking for co-conspirator Smith's drug suppliers, and the affidavit, inter alia, established that authorities made several significant narcotics purchases from Smith and had traced him to a New Jersey house. It also showed that Smith's base of operations, an apartment in a multiple dwelling, and his home, located in a residential neighborhood, presented surveillance problems. At least one of the doormen at the apartment building was cooperating with Smith, and the police feared that an unknown vehicle would arouse suspicion in a residential neighborhood. The affidavit also established that the informant who was used to gain access to Smith did not know Smith's suppliers, and that the authorities had tried to make headway in identifying these suppliers via installation of less intrusive pen register devices. Accordingly, the affidavit established that the authorities satisfied their obligation to exhaust normal investigative procedures. The affidavit recited more than a bare, generalized statement that other investigative methods would be unsuccessful (*United States v. Lilla*, 699 F.2d 99).

*People v. Yanez*, 178 A.D.2d at 357–58, 577 N.Y.S.2d at 622 (citations omitted).

Yanez's counsel sought leave to appeal to the Court of Appeals, again focusing on the wiretap suppression issue, an issue he contended "should be of interest to the Court of Appeals" to correct what he perceived as judicial "rubber-stamping" of cursory police affidavits that did not comport with the statutory intent. (Klempner 1/21/92 Letter to Court of Appeals at p. 1) Yanez's counsel wrote:

> This issue should be of interest to the Court of Appeals because it presents an opportunity to determine whether, in routine mid-level narcotics investigations, the police are ignoring the "exhaustion requirement" of sections 700.15(4) and 700.20(d) of the Criminal Procedure Law, and whether reviewing trial courts—and indeed the justices of the Appellate Division—are permitting this ignoring and are rubber-stamping the recitations of the police that wiretaps were needed because conventional law enforcement methods would not work.
>
> In seeking leave on this issue, Appellant does not contend simply that the Appellate Division's review of the facts as they relate to the satisfaction of the exhaustion requirement was faulty; it is Appellant's contention that the Appellate Division failed to make any meaningful review whatsoever, instead leaving that review to the police officers themselves. The result has been an utter evisceration of an important statutory (and indeed, constitutional) limitation on the power of the police to eavesdrop on citizens' telephone conversations, an evisceration never contemplated by the Constitution, by the Legislature or by this Court.

(*Id.* at 1–2.) The Court of Appeals nevertheless denied leave to appeal. *People v. Yanez*, 79 N.Y.2d 954, 583 N.Y.S.2d 209, 592 N.E.2d 817 (1992).

### *Yanez's State Collateral Attack*

On or about August 9, 1993, new counsel for Yanez (the same lawyer representing him on this federal habeas petition) brought an ineffective assistance of trial counsel motion in New York Supreme Court pursuant to C.P.L. § 440.10 and § 440.20. (*See generally* Yanez 8/9/93 Sup.Ct.Br.) Yanez sought to set aside his sentence to the extent of conforming it to the 8 years to life he had been offered in the rejected plea bargain. (*See id.* at 1, 4.) Based entirely on the First Department's rejection of Yanez's appeal, new counsel argued that prior counsel was ineffective for not advising Yanez to accept the plea

offer, because "a realistic assessment of the law and the facts in this case" showed that Yanez's chances on appeal were "poor." (*Id.* at 4.) In support of the motion, Yanez submitted his affidavit and that of his prior counsel, to the effect that both thought his appeal "would have merit and a reasonable chance of success." (These two affidavits are quoted extensively at pages 3–5 above.)

The trial judge, Justice Leslie Crocker Snyder, rejected Yanez's ineffective assistance claim. (*See* Justice Snyder's 2/3/94 Op.) Justice Snyder specifically complimented defense counsel on his motion to suppress the wiretaps, stating:

> This Court has presided over a number of trials involving eavesdropping evidence and the motion filed by counsel for defendant Yanez challenging the wiretap evidence were some of the most detailed and analytical motions that this Court has received.

(*Id.* at 1.) Justice Snyder also noted Yanez's active involvement in his defense:

> Initially, this court notes that both the defendant's affidavits and the affidavit of defense counsel indicate that the defendant took a very active role in his defense. There is no question that the defendant and counsel discussed the merits or the defense case including the merits or the defendant's eavesdropping motions.

(*Id.* at 2.) Finally, Justice Snyder rejected the ineffective assistance claim as Monday morning quarterbacking:

> The court finds that the defendant was fully informed by counsel of the charges against him and the strength of the People's case. There is also no question that counsel filed cogent pre-trial motions to contest the most damaging evidence against the defendant and that, at trial, counsel vigorously cross-examined the witnesses and put forth the best defense he could under the circumstances. Now that he has lost at trial, and lost on appeal, the defendant is claiming that he should have accepted the plea offer.
>
> Unfortunately for the defendant, the measure of effective representation is not what the defendant, in hindsight, should have done. The issue is whether counsel

was competent and provided meaningful representation. The court finds that the defendant was ably represented by counsel and the defendant's motion is denied.

(*Id.*)

Yanez sought leave to appeal to the First Department. In opposing the motion, the People noted that trial counsel's advice was reasonable and that the People had taken the direct appeal seriously:

> [T]he issue [defense counsel] raised concerning the wiretap application was hardly frivolous or doomed to fail, as defendant now suggests. Mr. Klempner never told defendant that the appeal would certainly result in a reversal. Rather, he stated that it had "a reasonable chance of success." In fact, the issue was vigorously argued on appeal: the People certainly took the claim seriously, producing a thirteen page point and citing both state and federal cases. In short, Mr. Klempner's assessment was not an unfair or unreasonable one.

(Gov't 7/21/94 Letter to 1st Dep't at pp. 3–4.)

On August 4, 1994, the First Department denied leave to appeal in an unpublished order.

Yanez's federal habeas petition followed, in February 1995.

## ANALYSIS

### I. YANEZ'S COUNSEL WAS NOT INEFFECTIVE UNDER THE STRICKLAND v. WASHINGTON TEST

#### A. *The Strickland v. Washington Standard*

The Supreme Court has announced a two-part test to determine if counsel's assistance was ineffective. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* This performance is to be judged by an

objective standard of reasonableness. *Id.* 466 U.S. at 688, 104 S.Ct. at 2064.

Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction.... A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.... [A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

*Id.* 466 U.S. at 689, 104 S.Ct. at 2065.

Second, the defendant must show prejudice from counsel's performance. *Id.* 466 U.S. at 687, 104 S.Ct. at 2064. The "question is whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt." *Id.* 466 U.S. at 695, 104 S.Ct. at 2068–69. Put another way, the "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* 466 U.S. at 694, 104 S.Ct. at 2068.

In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, *a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.*

*Id.* 466 U.S. at 695–96, 104 S.Ct. at 2069 (emphasis added); *see also, e.g., DeLuca v. Lord,* 77 F.3d 578, 584 (2d Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 83, 136 L.Ed.2d 40 (1996).

The Supreme Court has counseled that these principles "do not establish mechanical rules." *Strickland v. Washington,* 466 U.S. at 696, 104 S.Ct. at 2069. The focus of the inquiry should be on the fundamental fairness of the trial and whether, despite the strong presumption of reliability, the result is unreliable because of a breakdown of the adversarial process. *Id.* The Supreme Court also made clear that "there is no reason for a court deciding an ineffective assistance claim ... to address both components of the inquiry if the defendant makes an insufficient showing on one.... If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Id.* 466 U.S. at 697, 104 S .Ct. at 2069.

In addition, the Supreme Court also has counseled that "strategic choices made after thorough investigation of law and facts relevant to plausible óptions are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* 466 U.S. at 690–91, 104 S.Ct. at 2066; *see also, e.g., Mayo v. Henderson,* 13 F.3d 528, 533 (2d Cir.1994) (a reviewing court "may not use hindsight to second guess [counsel's] strategy choices.").

**B.** ***Application of the Strickland Standard to Yanez's Ineffective Assistance Claim***

■ Under the applicable legal standards, it is clear that Yanez's ineffective assistance claim does not meet the first prong of the *Strickland* test.

Yanez's current counsel states that "Federal and State Courts have found that an attorney's inaccurate or untenable advice which results in a defendant's rejection of a plea bargain and an unreasonable decision to proceed to trial gives rise to a claim of ineffective assistance of counsel," citing nine decisions, all but one of which are from outside this Circuit. (Yanez Br. at 3.) None of the cases cited by Yanez's current counsel, however, are relevant to the facts of Yanez's case. For example, in both *United States v. Blaylock,* 20 F.3d 1458, 1465–66 (9th Cir. 1994), and *United States ex rel. Caruso v. Zelinsky,* 689 F.2d 435, 437–38 (3d Cir.1982), counsel was found ineffective for failing to even advise the defendant of a plea bargain offer. In five of the cases cited in Yanez's brief, counsel was found ineffective for misrepresenting the maximum sentence the defendant faced if convicted after trial (often because of the effect of career offender enhancements), causing the defendant to forego plea offers. *See United States v. Thompson,* 27 F.3d 671, 674 (D.C.Cir.), *cert. denied,* 513 U.S. 1050, 115 S.Ct. 650, 130 L.Ed.2d 554 (1994); *United States v. Day,* 969 F.2d 39, 41–44 (3d Cir.1992) *Beckham v. Wainwright,* 639 F.2d 262, 264–67 & n. 6 (5th Cir.1981); *Alvernaz v. Ratelle,* 831 F.Supp. 790, 794–95 (S.D.Cal.1993); *United States v. Busse,* 814 F.Supp. 760, 764–65 (E.D.Wis.1993). In the only case from within this Circuit, *United States v. Smith,* 824 F.Supp. 420 (S.D.N.Y. 1993), the defendant claimed counsel was ineffective for failing to advise him of the option to plead guilty while still contesting the relevancy of the amount of drugs involved at a Fatico hearing. The district court merely concluded that on the record before the court "it is impossible to determine whether or not defense counsel's failure to advise Mr. Smith of the Fatico hearing option violated Mr. Smith's Sixth Amendment rights, because it is unclear whether, under the terms of the initial plea bargain offer, a Fatico hearing of the type defense counsel currently envisions ever really was available to Mr. Smith." *Id.* 824 F.Supp. at 426.

Here, in contrast to those cases, it is undisputed that Yanez was informed of the plea offer, and was aware that he likely would be convicted at trial. Moreover, Yanez was ac-tively involved in his defense, and he read the suppression motion papers and researched the case law. The issue thus is whether counsel's assessment that an appeal of the denial of the suppression motion had "merit" was so erroneous as to be ineffective assistance. With the benefit of twenty-twenty hindsight, Yanez's new counsel contends that "a realistic assessment of the law and the facts reveals that Mr. Yanez had no real chance of reversing the denial of the motion to suppress or at best only a slim chance." (Yanez Br. at 4.) Yanez's current counsel offers no additional explanation for this conclusion.

The issue here was purely strategic—how would the First Department apply the New York wiretapping statute and the cases interpreting it to the facts of Yanez's case. Yanez's trial counsel cited appropriate case law and ably marshalled the facts to attack the wiretap authorizations. Yanez's appeal to the First Department appropriately relied on *United States v. Lilla,* 699 F.2d 99 (2d Cir. 1983), and *People v. Viscomi,* 113 A.D.2d 76, 495 N.Y.S.2d 298 (4th Dep't 1985), *appeal denied mem.,* 67 N.Y.S.2d 658, 499 N.Y.S.2d 1055, 490 N.E.2d 572 (1986), and the cases cited in both decisions. (*See* Yanez 1st Dep't Br. at 10–14.)

In *Lilla,* the Second Circuit noted that "[f]or practical purposes the federal and New York statutory requirements are the same [for authorizing a wiretap]. Both require a showing that investigative procedures less intrusive than a wiretap have been tried or are unlikely to succeed if tried." *United States v. Lilla,* 699 F.2d at 102 (fn. omitted). The Second Circuit discussed the legislative intent behind the restrictions on authorizing wiretaps:

The Supreme Court has told us that the requirement is "simply designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime," and while traditional surveillance techniques need not be exhausted first if they are "impractical" or costly and inconvenient, nevertheless Congress—and, we may add, the New York legislature—

evinced the clear intent to make doubly sure that the statutory authority be used with restraint.... These [wiretap] procedures were not to be routinely employed as the initial step in criminal investigation. Rather, the applicant must state and the court must find that normal investigative procedures have been tried and failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous.

To this end, both the New York and the federal statute require a "full and complete statement" explaining whether other investigative procedures have been tried and have failed, or appear "unlikely to succeed" or are "too dangerous." Although the required showing is to "be tested in a practical and commonsense fashion," an affidavit offered in support of a wiretap warrant must provide some basis for concluding that less intrusive investigative procedures are not feasible.

*Lilla,* 699 F.2d at 102–03 (citations omitted). The Second Circuit further recounted the factors that have caused wiretaps to be approved or invalidated in New York:

[W]here the location of the subjects of the investigation precludes the use of informants or nonwiretap surveillance, wiretap warrants have been upheld. Wiretaps have also been approved where the police have attempted and failed to infiltrate a criminal conspiracy involving individuals with prior records who were "careful and evasive" following the unsuccessful use of search warrants, and where the nature of the offense is such that only electronic surveillance can produce the evidence necessary for conviction. Wiretap warrants have been invalidated, however, where the record indicated that other procedures might have been used successfully.... In contrast to those New York cases and cases from our own court where wiretap warrants have been upheld, in this case, ... the "use of the wiretap was merely a useful additional tool" and therefore "should never have been authorized."

*Lilla,* 699 F.2d at 103–04 (citations omitted).

Most importantly, *Lilla* emphasized that "generalized and conclusory statements" in the wiretap affidavit are not sufficient:

The requirement of a "full and complete statement" regarding procedures attempted or considered prior to the application for a wiretap serves both to underscore the desirability of using less intrusive procedures and to provide courts with some indication of whether any efforts were made to avoid needless invasion of privacy. Like other courts, we reject generalized and conclusory statements that other investigative procedures would prove unsuccessful.

*Lilla,* 699 F.2d at 104 (emphasis added). The Second Circuit held the warrant affidavit before it deficient because the affidavit was conclusory, and there was no indication that visual surveillance would not have been successful; moreover, an informant had introduced an undercover officer, who was able to make drug buys from Lilla. *Id.* 699 F.2d at 104–05. The Second Circuit concluded that the "affidavit supporting the application for the wiretap does nothing to allay our fears that the State in this case relied on wiretapping as a substitute for standard investigative procedures, a result that both the New York and federal statutes are designed to avoid. The statutory requirements are not so lightly to be regarded." *Id.* 699 F.2d at 105 (fns. omitted). Based on the factual arguments ably advanced by Yanez's counsel, the Court cannot say that the chances were slim to non-existent that the First Department would have reached a similar conclusion in Yanez's case.

The second case Yanez cited to the First Department, *People v. Viscomi,* also suppressed wiretaps that were based on conclusory affidavits. The *Viscomi* court reviewed the basis for and the protections encompassed in New York's statutory scheme governing wiretaps:

At the outset it is important to recall that a wiretap is a most serious invasion of privacy and individual liberty. The tapping of a person's telephone invades the privacy of every other person whom that person may call or who may call him. Our application of CPL 700.15[4], therefore, must be sensitive to the constitutional guarantees against search and seizure that

the statute seeks to protect and the statute must be strictly construed. Electronic surveillance is appropriate only when necessary and is "not to be routinely employed as the initial step in a criminal investigation." Thus, no eavesdropping warrant may issue absent "a showing that normal investigative procedures have been tried and have failed, or reasonably appear to be unlikely to succeed if tried, or to be too dangerous to employ" (CPL 700.15[4]; *see also,* 18 U.S.C. § 2518[1][c] ).

*Viscomi,* 113 A.D.2d at 76–77, 495 N.Y.S.2d at 299 (citations omitted). The *Viscomi* court affirmed the trial court's suppression of the wiretaps, because the supporting affidavits were too conclusory:

Thus, the only way to comply with the statute was for the police to establish that the employment of normal investigative techniques "reasonably appear to be unlikely to succeed if tried" (CPL 700.15[4] ). The affidavits, however, fail to mention any facts indicating that the police investigation involved anything other than a routine narcotics operation. No investigatory efforts are disclosed. Lieutenant Sardino's affidavit in support of the application for wiretap 83–1 recited only that other investigative procedures were too dangerous "due to the high level of police awareness" of one of the suspects. This conclusory statement, however, was inconsistent with the officer's own description of the investigation in which he acknowledged that on at least three occasions he purchased drugs from the suspect and that he could purchase more drugs at any time. This is precisely the sort of success with normal investigative procedures which indicates that resort to the highly intrusive use of electronic surveillance is unnecessary. Thus, the use of a wiretap here was "merely a useful additional tool" which should never have been authorized.

*Viscomi,* 113 A.D.2d at 77–78, 495 N.Y.S.2d at 300 (citations omitted).

The *Viscomi* dissent had stated the following as to identification of the defendant's drug supplier:

Treating the People's showing in a practical and commonsense fashion in the context of the objectives of the investigation as delineated in the application, I find that the court did not abuse its discretion in issuing the warrants. The applications show that the police used traditional investigative techniques to make three purchases of cocaine from a drug seller at the street level. These techniques were unsuccessful in revealing the identity of suppliers higher in the chain of illicit drug distribution and in gathering evidence against them. The seller of the cocaine had exhibited extreme wariness of police surveillance and was suspicious of the undercover officer who had made the purchases. It was obvious that he was unlikely to reveal the source of his supplier to the undercover officer and further surveillance of him was not only dangerous, but it would be unlikely to lead to information necessary to identify and convict his supplier and other wholesale distributors.

*Viscomi,* 113 A.D.2d at 79, 495 N.Y.S.2d at 301 (dissenting opinion). The *Viscomi* majority's rejection of the dissent's reasoning could well have applied to Yanez:

Under the rationale of the dissent, any time the police want to wiretap a criminal suspect's phone, all they need to allege is that normal investigative procedures will not suffice. Mere conclusions of the affiant, however, do not satisfy the strict statutory requirements. Much of what the dissent relies upon to sustain the warrants could be said of any drug investigation. The identity of suppliers is rarely revealed. Drug sellers are frequently wary of police surveillance. Nothing in the affidavits distinguishes this case from any other drug case. We reject the dissent's implication that since all drug cases are tough to crack, the government need only show that narcotics activity is afoot to justify electronic surveillance. The wiretap statute and precedent do not support this view. Accordingly, the order of suppression should be affirmed.

*Viscomi,* 113 A.D.2d at 78, 495 N.Y.S.2d at 300 (citations omitted). Yanez's counsel was not ineffective because, with the benefit of hindsight, we now know that the First De-

partment distinguished *Viscomi* and held against Yanez.

Yanez's counsel researched the applicable case law. Indeed, Yanez himself conducted research, read the case law and concurred with counsel's view. Indeed, there was no real dispute between Yanez and the government as to the statutory requirements and the interpretation of those requirements by the New York courts. The appeal, therefore, was fact intense. Justice Snyder's observation with respect to the trial level suppression motion is equally applicable to the brief on appeal—Yanez's counsel did a masterful job of marshalling the facts to show that the police had not shown that ordinary investigative techniques would not succeed. (*See* Justice Snyder's 2/3/94 Op. at 1, quoted at pages 13–14 above.) *Lilla* and *Viscomi* accepted very similar factual arguments in invalidating wiretap warrants. The fact that the First Department disagreed with Yanez's counsel's argument does not render counsel ineffective. It merely means that counsel's strategy—with which Yanez had concurred—ultimately was unsuccessful. *Strickland* instructs that hindsight does not convert a reasonable strategy into ineffective assistance.

### CONCLUSION

For the reasons set forth above, Yanez's trial counsel was not ineffective, and the Court should deny Yanez's habeas petition.

### FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

■ Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from receipt of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Charles S. Haight, 500 Pearl Street, Room 1940, and to the chambers of the undersigned, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Haight. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas*

*v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *IUE AFL—CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993), *cert. denied,* 513 U.S. 822, 115 S.Ct. 86, 130 L.Ed.2d 38 (1994); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696 (1992); *Small v. Secretary of Health & Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 57–59 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237–38 (2d Cir.1983); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).